## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHAMROCK COMMUNICATIONS, LLC | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.:** |
| | ) | **5:06-cv-963-PWG** |
| CHARTER COMMUNICATIONS, INC., a | ) | |
| successor in interest to Charter | ) | |
| Communications Holding Company, LLC | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is diversity case in which plaintiff Shamrock Communications, LLC ("Shamrock")

claims that defendant Charter Communications, Inc. ("Charter") is liable for breach of contract and

for breach of the implied covenant of good faith and fair dealing.  The action is now before the court[1]

on a motion for summary judgment filed by Charter.  (Doc[2]. 69).  The parties have briefed and filed

evidence in support of their respective positions on Charter's motion (*see* Docs. 69, 73, and 77),

which is now ripe for decision. Upon consideration, the court concludes that Charter's motion for

summary judgment is due to be granted.

## I.      SUMMARY JUDGMENT STANDARDS

Rule 56(c)(2), Fed. R. Civ. P., provides that summary judgment "should be rendered if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[1] The action is before the undersigned magistrate judge pursuant to the General Orders of Reference dated July 25, 1996 and May 8, 1998, as amended July 27, 2000.  The parties have consented to exercise of plenary jurisdiction by a magistrate judge, pursuant to 28 U.S.C. § 636(c)(1) and LR 73. (Doc. 41).

[2] References herein to "Doc. __" are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Where the movant will not bear the burden of proof on a claim or issue at trial, the movant can satisfy this initial burden of production at summary judgment by pointing to specific portions of the record materials on file that either negate an essential element of the non-movant's claim or that affirmatively indicate "that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark*, 929 F.2d at 608; *see also United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 & n.19 (11th Cir. 1991) (en banc). On the other hand, when the moving party has the burden of proof at trial, as with a defendant attempting to establish an affirmative defense, it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Four Parcels*, 941 F.2d at 1438.

Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P., "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

2

## II.    BACKGROUND[3]

Formed in 1999 by managing partner Doug McKee and his wife, plaintiff Shamrock is a contractor that builds, installs, and upgrades cable for television cable systems.  In that first year, approximately ninety percent of Shamrock's business was derived from work performed under an agreement with Falcon Cable ("Falcon"), a cable television service provider in northern Alabama.  Shamrock acted as Falcon's exclusive contractor in the area, such that if other companies contacted Falcon about doing construction work, Falcon would refer them to Shamrock, which might then consider using them as a subcontractor.   In June 1999, Falcon approached Shamrock about rebuilding the Decatur, Alabama cable system, and in response to that meeting with Falcon, McKee had Shamrock build a warehouse and buy additional equipment in anticipation of the increased business with Falcon that year.  That August, Falcon directed Shamrock to start the rebuild of the Decatur system, and Shamrock began hiring the crews and buying the equipment necessary for the project.

In late September 1999, defendant Charter had either acquired Falcon or was in the process of finalizing that purchase.  On September 20, 1999, Shamrock's operations manager Terry Jones attended a meeting at Falcon's offices with its regional manager and two Charter representatives, Tom Salters and John Franklin.   At the meeting, Jones was basically told by the Charter representatives that there "wouldn't be that many changes" when Charter took over (Deposition of Doug McKee taken April 12, 2007 ("McKee Dep. I"), Doc. 73-1, at 91-92), that Charter wanted

---

[3]         At summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts nor all of the facts.  *See Crawford v. Carroll*, 529 F.3d 961, 964 n.1 (11th Cir. 2008).

Shamrock to continue working during the changeover, and that Charter had a lot of building work to be done so Shamrock should "gear up" for more work.  (*Id.* at 83).

However, on February 8, 2000, before any contract was signed between Charter and Shamrock, McKee met with Charter regional construction manager Don Wilkerson.  At that time, Wilkerson told McKee that, on orders from Ron Johnson, Charter's Senior Vice President of Operations for the Gulf Region, Charter was going to be bringing in another contractor to share work on the Decatur area cable system rebuild project.  This upset McKee because he had been "under the assumption that it was going to be an exclusive contract for [Shamrock] to build Decatur," as had been its arrangement with Falcon.  (McKee Dep. at 92).  When McKee protested to Wilkerson, he told McKee that "he would talk to his people up above him and make it up to us."  (*Id.* at 93).

Approximately two weeks later, on or about February 23, 2000, McKee, on behalf of Shamrock, executed a contract with Charter, which provided in pertinent part:

> **WHEREAS, CABLE COMPANY** [Charter] desires **CONTRACTOR** [Shamrock] to provide necessary labor, services and equipment to construct new build, upgrade, rebuild, maintain, and install hereafter referred to as **"WORK"** in **CABLE COMPANY'S** cable TV operations ... and **CONTRACTOR** is ready, willing, and able to do such work.

> **NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions herein contained, the parties hereto and for themselves and for their successors and permitted assigns do hereby mutually covenant and agree as follows:

> 1.     **CONTRACTOR** hereby agrees to perform **"WORK"**, and in accordance with the **CABLE COMPANY** specifications in Exhibit A and B provided and as directed by **CABLE COMPANY** in a good and workmanlike manner, at **CONTRACTOR'S** sole cost and expense, except to the extent provided in paragraph 15 hereof.

> 2.     **CONTRACTOR** shall furnish all labor, transportation, equipment, tools and all other materials and incidentals as defined in Exhibit A and B necessary

4

to complete the **"WORK"**.  The **CABLE COMPANY** will supply equipment and materials for the project as specified in Exhibit A and B.

\* \* \*

6.  Time is of the essence with respect to **CONTRACTOR'S** performance of its obligations pursuant to this **AGREEMENT**.  **CONTRACTOR** shall start **"WORK"** hereunder within fifteen days after written notice, Exhibit F, to start the project is provided by **CABLE COMPANY** and all **"WORK"** hereunder shall be completed no later than the date specified in this contract. ....

\* \* \*

15.     **CABLE COMPANY** agrees to:

(a)  Pay **CONTRACTOR** for the **"WORK"** agreed to and performed in accordance with this **AGREEMENT** on the basis of the rates set forth in the bid sheets attached hereto as Exhibit C, which by this reference are made a part hereof ....  **CONTRACTOR** shall, on a weekly basis, submit invoices covering areas for which **"WORK"** has been completed and inspected and is accepted by **CABLE COMPANY**.

(Agreement #00-CCHC-23 (hereinafter the "Master Agreement"), Doc. 69-1).

The "Exhibit A" to cross-reference above was the "Work Description" of the Master

Agreement.  The Work Description delineated six different Charter-owned cable systems, including

"Falcon First Inc." and "Falcon Cablevision, a California L.P.," operating in 30 identified

municipalities in Alabama, including Decatur; as well as two in Georgia; one in Tennessee, and one

in Mississippi, in which Shamrock might "[c]onstruct new build, upgrade, install fiber, sweep

forward & reverse, and node certification."  (Master Agreement at 14).  Shamrock had previously

performed work on some of the systems and in some of the locations listed but not others.  (*See*

McKee Dep. I at 122-124). According to McKee, earlier in the day that he signed the Master

Agreement, he was told on a conference call by either Wilkerson or Steven Obenowski, also a

Charter representative, that this was the first time he was aware of that a Charter contract

encompassed such a wide geographical area of work, rather than just in an individual municipality.

(*See* McKee Dep. I at 128-31).  The Master Agreement's Work Description further provided:

> "This **AGREEMENT** with attachments shall remain in effect until December 31, 2000.  Within this period, subsequent purchase order [sic] may, solely at the **CABLE COMPANY'S** discretion, be issued without executing a new **AGREEMENT**.  The **CABLE COMPANY** is under no obligation to provide **CONTRACTOR** consistent work during the entire effective period of **AGREEMENT**."

> The **CABLE COMPANY** is not responsible for payment for any work performed without an executed **"NOTICE TO PROCEED"** and a valid purchase order.

 (Master Agreement at 14).

"Exhibit F" to the Master Agreement is a form "Notice to Proceed," to be completed by

Charter and issued to Shamrock pursuant to paragraph 6 of the body of the contract.  (*Id.* at 63; *see*

*also id.* at 2.).  It provides in relevant part:

> As provided for in the Contract **AGREEMENT** dated _____, 19__ between ____ ("Owner") and _____ ("**CONTRACTOR**").  Owner hereby gives **CONTRACTOR** its "Notice to Proceed" pursuant to Paragraph 10 (b) [sic][4] of the Contract **AGREEMENT**.  **CONTRACTOR** may commence work on the project at this time if **CONTRACTOR** possesses a valid Purchase Order for the work. Purchase Order Number _____.

(*Id.* (footnote added)).

The Master Agreement also contains an integration clause, stipulating that the written

document constituted the entire agreement between the parties (Master Agreement at 10, ¶ 32), as

well as a provision specifying that no amendment, modification, or waiver will be deemed binding

---

[4] Although the "Notice to Proceed" that is Exhibit F to the Master Agreement cross-references paragraph "10 (b)" of what appears to be the body of the Master Agreement, there actually is no such paragraph "10 (b)." There is a paragraph 10 to the Master Agreement, but it contains no subparts.  Further, that paragraph relates to inspection of the contractor's work by the cable company and does not mention or otherwise contain terms about a "Notice to Proceed."  Rather, an "Exhibit F" is cross-referenced in paragraph 6 of the Master Agreement, which is described as a "written notice ... to start the project."

unless made in writing and signed by the parties.  (*Id.* at 8, ¶ 22).  Finally, the Master Agreement contains a choice-of-law clause specifying that it will be "governed by and construed and enforced in accordance with" Missouri law.  (*Id.* at 6, ¶ 19).

Despite having been told by Charter on February 8th that an additional contractor was being hired to work on the Decatur project, McKee states that he believed the Master Agreement he signed approximately two weeks later provided Shamrock with exclusive rights in all of the areas listed in the Work Description, including Decatur. (McKee Dep. I at 159-60).  However, in March 2000, only a few weeks after signing the contract, McKee was a party to conference calls with representatives of both Charter and other contractors, which included Crown Fiber Communications ("Crown Fiber") and Rogers Construction, that other contractors were performing work for Charter in Decatur and in other areas of Anniston and Albertville, Alabama that McKee had considered to be Shamrock's exclusive territory.  (*See* McKee Dep. at 149-56, 159-61; Deposition of Doug McKee taken June 12, 2007 ("McKee Dep. II"), Doc.  69-3, at 32-35, 38-41).

The Master Agreement expired on December 31, 2000, and Charter did not renew it or enter into a new contract with Shamrock.  During the approximately 10-month period that the contract was in effect, Charter paid Shamrock approximately $2.7 million for construction and maintenance work. McKee acknowledges that while that amount of business might have been a little bit of a change, it was about the same amount as Shamrock had done working for Falcon in 1999.  Shamrock has claimed in its complaint, however, that it would have received substantially more work from Charter under the Master Agreement but for the existence of a bribery scheme allegedly perpetrated by Billy Jones, the owner of Shamrock's competitor, Crown Fiber.  Specifically, Shamrock alleges that, unbeknownst to it, Jones paid bribes and kickbacks in 1999 and 2000 to key members of Charter's

management, including Ron Johnson, which resulted in Charter assigning cable construction work in north Alabama to Crown Fiber that would and should have otherwise gone to Shamrock.  (Doc. 1 ("Complaint" or "Compl."), ¶¶13-14).  In its brief in opposition to Charter's motion for summary judgment, Shamrock has outlined in detail the alleged nature, scope, and extent of the bribery scheme.  (*See* Doc. 73 ("Shamrock's Summ. J. Opp. Brief"), at 8-14).  However, Charter's instant motion does not seek to challenge Shamrock's allegations with regard to either the existence of the bribery scheme or the potential effect it had upon respective work assignments to Crown Fiber and Shamrock.  Accordingly, it suffices to state that, for purposes of summary judgment, it is assumed both that Crown Fiber, did, in fact, give substantial bribes and kickbacks to Charter employees and that doing so allowed Crown Fiber to secure preference in the assignment of Charter work in geographical areas covered by the Master Agreement during its effective period from February to December 2000.

Shamrock filed this action against Charter on May 19, 2006, pursuant to 28 U.S.C. § 1332. (Compl.)  Shamrock's complaint includes two counts that are relevant to Charter's instant motion for summary judgment:  Count Two, which alleges claims for "breach of contract" (*id.* at ¶¶ 34-37) and Count Three, which alleges claims for "breach of the implied covenant of good faith and fair dealing."  (*Id.* at ¶¶ 38-42).  Each of these types of claims is premised upon the theory that Charter is liable under Missouri law because it wrongfully assigned work to Crown at Shamrock's expense, either because the Master Agreement gave Shamrock exclusive rights in the territory it covered, because Charter acted in bad faith by giving preference in work assignments to Crown Fiber as a

result of the kickback scheme, or both.[5]  While there are some allegations in the complaint that seem to suggest that Shamrock might be claiming that Charter is liable for wrongfully failing to *renew* its contract after the Master Agreement expired on December 31, 2000, Shamrock has made clear that it is not pursuing such claims.  Rather, Shamrock states that its "damage claims in this lawsuit are limited to 2000 and seek recompense for its loss of the opportunity to do work that it otherwise would have performed had it not been wrongfully assigned to Crown [Fiber] in furtherance of the bribery scheme ...."  (Shamrock Opp. Brief at 20).  Charter has now moved for summary judgment on the remaining claims, arguing that they are due to be dismissed based both upon evidence that Charter contends establishes that Shamrock cannot prove the merits of its claims and upon a statute-of-limitations affirmative defense.

## III.   DISCUSSION

### A.   Exclusivity Under the Master Agreement

Charter argues that it is entitled to summary judgment on Shamrock's claims to the extent that they are based upon the theory that the Master Agreement gave Shamrock an *exclusive* right to perform Charter's cable system construction and maintenance work in the geographical areas set forth in the Work Description during the period covered by the contract.  In these claims, Charter is liable simply because its hiring Crown Fiber to perform work encompassed by the Master

---

[5]The other count of Shamrock's complaint, Count One, sought a declaratory judgment holding that a release that Shamrock had executed in connection with a prior lawsuit against Charter covered only claims by Shamrock for unpaid invoices and did not address any claims Shamrock might have related to the wrongful assignment of work to Crown Fiber.  (*See* Compl. ¶¶ 16-25, 29-33).  The court has effectively already granted Shamrock that relief by granting its earlier motion for partial summary judgment to the extent that it sought the dismissal of Charter's pled affirmative defense that Shamrock's claims are barred by the release Shamrock executed in the earlier litigation. (*See* Doc. 62 at 5-8).

Agreement violated Shamrock's exclusive rights, regardless of Charter's motives or the bribery scheme. The parties agree that these claims are governed by the substantive law of Missouri, pursuant to the choice-of-law provision in the Master Agreement.

Charter first argues that the Master Agreement unambiguously establishes that Shamrock's right to perform work thereunder was not exclusive.   Charter thus maintains that it remained free to hire other contractors, including Crown Fiber, to share cable system construction or maintenance work in the north Alabama municipalities delineated in the Master Agreement.   Charter further argues that because the Master Agreement is unambiguous and contains an integration clause, parol evidence cannot be offered by Shamrock to show contrarily that Shamrock's rights were exclusive. For its part, Shamrock does not argue, at least not clearly, that the Master Agreement establishes unambiguously that Shamrock was granted exclusive rights.   Rather, Shamrock seems primarily to argue that the contract is ambiguous such that it is reasonable to interpret it as granting exclusive rights and that there is, therefore, a jury question on the issue of the parties' intent.

"The guiding principle of contract interpretation under Missouri law is that a court will seek to ascertain the intent of the parties and to give effect to that intent.   The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms.   If the contract is unambiguous, it will be enforced according to its terms." *Triarch Indust., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. 2005) (citations omitted).   Accordingly, where a written contract is unambiguous, that is the end of the analysis, for the parol evidence rule prohibits consideration of extrinsic evidence to vary or contradict the terms of the agreement or to create an ambiguity. *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428-29 (Mo. 2003); *Ortbals v. Director of Revenue*, 871 S.W.2d 435, 437 (Mo. 1993).

10

In connection with determining the existence of ambiguity, the Missouri Supreme Court has explained:

> "[A] contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences." [*State ex rel. Vincent v. Schneider*, 194 S.W.3d [853, 860 (Mo. 2006)]. "A contract is not ambiguous merely because the parties disagree as to its construction." *Id.* "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (quoting *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. 1997)).

*Ethridge v. Tierone Bank*, 226 S.W.3d 127, 131 (Mo. 2007). "[T]he term 'ambiguous' means a susceptibility to two or more meanings as well as a vagueness of meaning[.]" *Laiben v. Department of Revenue*, 572 S.W.2d 173, 175 (Mo. 1978).

To the extent that Shamrock may be arguing that the Master Agreement unambiguously conferred upon it an exclusive right to perform work in delineated areas during its effective period, the court disagrees. Shamrock points to no contract language to that effect. The Master Agreement does not characterize Shamrock as having "exclusive" rights or an "exclusive" territory. The contract does not expressly state that Charter was hiring only Shamrock to perform all work potentially encompassed within the scope of the contract or to fulfill all of Charter's construction requirements that might arise during a certain period or within a specified area. Nor does the contract prohibit Charter from engaging additional contractors.

The question of whether the Master Agreement unambiguously provides that Shamrock's rights were *not* exclusive is a closer question. In support of its claim that the contract afforded no exclusive rights, Charter relies upon *Danella v. Southwestern Bell Telephone Co.*, 775 F. Supp. 1227 (E.D. Mo. 1991), *aff'd*, 978 F.2d 1263 (table), 1992 WL 323498 (8th Cir. 1992). The plaintiff

contractor there sued a telephone company for, among other things, breach of contract based upon the covenant of good faith and fair dealing for terminating their relationship under "continuing unit price agreements," because the plaintiff had refused to contribute towards the phone company's CERCLA[6] liability associated with excavation work the plaintiff had performed for the phone company. *See id.*, 775 F. Supp. at 1235. However, *Danella* is distinguishable, at least as far as the issue of ambiguity relative to exclusivity is concerned. In holding that the plaintiff contractor could not prevail on its claims for breach because it had no right to any additional work, the *Danella* court relied upon language in the contracts providing that the defendant "Telephone Company does not commit itself to order any specific quantity of work under this agreement and may have the same or similar work performed by its own employees or other contractors." *Id.* at 1236. By contrast, the Master Agreement contain no such express reservation of rights to Charter to hire other contractors to perform covered work.

Charter also points to the following language in the Work Description of the Master Agreement as foreclosing exclusive rights in Shamrock:

> "This **AGREEMENT** with attachments shall remain in effect until December 31, 2000. Within this period, subsequent purchase order (sic) may, solely at the **CABLE COMPANY'S** discretion, be issued without executing a new **AGREEMENT**. The **CABLE COMPANY** is under no obligation to provide **CONTRACTOR** consistent work during the entire effective period of **AGREEMENT**."

> The **CABLE COMPANY** is not responsible for payment for any work performed without an executed "**NOTICE TO PROCEED**" and a valid purchase order.

---

[6] The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

(Master Agreement at 14).  In particular, Charter relies upon the statement that it was "under no

obligation to provide [Shamrock] consistent work during the entire effective period" of the contract.

It might be argued, however, that such language could be interpreted as merely clarifying that

Shamrock was not guaranteed any particular amount of work because there could be periods covered

by the contract during which Charter might not require the performance of any covered work, rather

than that Charter would remain free to hire a third party, instead of Shamrock, to perform covered

work.  Ultimately, though, it is clear from the provisions of the Work Description that Shamrock was

not authorized to perform any work for Charter under the contract unless Charter executed and

issued to Shamrock both a "Notice to Proceed" and a purchase order specifying the particular work

to be done.  The Work Description further specifies that within the effective period of the Master

Agreement, *i.e.*, from on or about February 23 to December 31, 2000, "subsequent purchase order

(may), *solely at the Cable Company's discretion*, be issued without executing a new

**AGREEMENT**."  (*Id.* (emphasis added)).  It is not as clear as it might be what the word

"subsequent" means in this context.  It could perhaps mean that the parties contemplated that Charter

would be issuing *one* purchase order pursuant to the Master Agreement and that Charter could issue

one or more purchase orders on the same terms "subsequent" to issuing the first one.  Or it might

mean that Charter could issue purchase orders "subsequent" to the effective date of the Master

Agreement, in which case the decision to issue any purchase order at all was left "solely" to

Charter's "discretion."[7]  Either way, however, the decision whether to issue any purchase order to

---

[7]If interpreted to be non-exclusive and to provide that the decision whether to issue any purchase orders at
all was left entirely up to Charter's unfettered discretion, the Master Agreement would itself not be an enforceable
contract because no consideration would have flowed to Shamrock, with any promise made by Charter being
illusory.  *See Structural Polymer Group, Ltd. v. Zoltek Corp.*, 543 F.3d 987, 993 (8th Cir. 2008) ("[I]f SP had an
unfettered option to purchase from another supplier during the term of the contract, then this option would destroy
the exclusivity of the arrangement, and demonstrate lack of consideration.").  Rather, "[t]he promise of the seller

Shamrock beyond a first one, and perhaps whether to issue any purchase order at all, was expressly left "solely" to Charter's discretion. As such, Shamrock would have known just from the contract language that Charter had not actually promised to provide Shamrock with any work, at least after an initial purchase order, and that Shamrock thus did not have a right to perform all construction work for Charter in north Alabama.

Even assuming, however, that the language of the Master Agreement does not unambiguously confirm that Shamrock's rights were not exclusive, that conclusion is still the only reasonable one that can be reached upon consideration of the extrinsic evidence. If contract language is ambiguous, a court may look to parol evidence of the parties' intent, including "the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties." *Royal Bank of Missouri v. Fridkin*, 819 S.W.2d 359, 362 (Mo. 1991)[8]. Where a written agreement is ambiguous, parol evidence may be used to establish whether parties did or did not intend to create a requirements contract under which one party is to act as the exclusive supplier of goods or services for the other at an agreed price. *See Kirkwood-Easton Tire Co. v. St. Louis County*, 568 S.W.2d 267, 269 (Mo. 1978); *Universal Power Syst., Inc. v.*

becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." *Propane Indus.*, 429 F. Supp. at 219.

   [8]The "parol evidence rule" is actually a substantive rule of contract law. *See Clanton v. Inter.Net Global, LLC*, 435 F.3d 1319, 1326 n.8 (11th Cir. 2006); *Kenney v. Vansittert*, 277 S.W.3d 713, 719 (Mo. App. W.D. 2008). *City of Gulf Shores v. Harbert Inter.*, 608 So. 2d 348, 355 (Ala. 1992). Accordingly, the court looks to Missouri's parol evidence rule to assess whether and to what extent parol evidence may be considered when interpreting the contract. *Clanton, supra*.

*Godfather's Pizza*, 818 F.2d 667, 670-71 (8th Cir. 1987); *Propane Indus., Inc. v. General Motors Corp.*, 429 F. Supp. 214, 219-20 (W.D. Mo. 1977).

Shamrock's Doug McKee acknowledges that he was never told by Charter or its representatives that Shamrock would be the only contractor performing work in a particular area or that its rights were otherwise going to be "exclusive." To the contrary, McKee admits that just two weeks before he signed the Master Agreement (and some time less than that before receiving a blank copy for his review), Charter's Don Wilkerson told him at a meeting that Charter was going to be hiring an additional contractor to share work on the Falcon system rebuild in Decatur, which was the primary work being done by Shamrock at the time and undisputedly was work later encompassed by the Master Agreement. Further, Charter operated not only openly but also from the very outset of the Master Agreement as if that contract had *not* vested any exclusive right in Shamrock. "[T]he practical construction which the parties themselves place upon an agreement is of considerable significance in ascertaining the meaning of the terms of an ambiguous contract." *Modine Mfg. Co. v. Carlock*, 510 S.W.2d 462, 468 (Mo. 1974). The ink on the contract was barely dry when McKee confirmed in March 2000 on conference calls with representatives of Charter and other contractors that such other contractors were already performing work for Charter in areas covered by the Master Agreement, as Wilkerson had told him would be the case at the February 8th meeting. Given both that Charter had expressly advised McKee before signing the contract that Shamrock was not going to be acting as Charter's only contractor in north Alabama and that Charter operated both immediately and openly as if Shamrock's rights were not exclusive, it is simply not objectively reasonable to interpret the Master Agreement as having been intended by the parties to grant Shamrock exclusive rights.

15

Shamrock argues that several other pieces of extrinsic evidence nonetheless suggest that a jury could still find the parties intended Shamrock's rights to be exclusive.  Shamrock first points out that when Wilkerson first confirmed to McKee that another contractor would be sharing work on the Decatur project, McKee protested that Shamrock had been the only company doing that work for Falcon, and Wilkerson indicated that "he would talk to his people up above him and make it up to us."  (McKee Dep. I at 93).  However, such a vague statement about trying to seek favor in the future does not reasonably suggest that Shamrock had exclusive rights under the Master Agreement. McKee admits that Wilkerson never said that he would "give back [Shamrock's] exclusive contract" like Shamrock had enjoyed with Falcon (*id.* at 95).  There is also no evidence that Wilkerson ever told McKee after their meeting that he, Wilkerson, had been successful in convincing Charter to provide any other particular benefits for Charter, much less grant it the exclusive right to perform all of Charter's construction work.  Further, Wilkerson's statement at the meeting that he would try to "make it up" to Shamrock tends to indicate that Wilkerson considered the matter of another contractor being brought in to the region to be "a done deal," so to speak, but that he would attempt to *compensate*, *i.e.*, "make up," for the fact that Shamrock would not be the exclusive contractor by talking to his superiors about getting Shamrock some other, new work.   Indeed, that explanation appears consistent with the scope of the Work Description as drafted for the Master Agreement, which authorized Shamrock to work on several new systems and in a number of new locations, even if in a non-exclusive arrangement.

Shamrock also points to McKee's testimony that, earlier in the day that he signed the Master Agreement, he was told on a conference call by one of two Charter representatives on the line that this was the first time that the representative was aware of that a Charter contract encompassed such

16

a wide geographical area of work, rather than just in an individual municipality.  It is unclear, however, why Shamrock conceives such evidence to support that the parties intended Shamrock's rights under the agreement to be exclusive.  To the extent that the Charter representative stated that the contract was simply *different* in scope than other contracts he had seen, the court fails to see how such circumstance is indicative of exclusivity.  Likewise, insofar as Shamrock seeks to attach significance to the geographical scope identified in the Work Description as being *broader* than in other Charter construction contracts, that fact would, if anything, tend to cut *against* exclusivity. That is, all other things being equal, the broader and less discrete and particularized that a undertaking referenced in the contract would be, the less natural it is to assume that the buyer contemplated purchasing all associated goods and/or services from only a single source in an exclusive arrangement rather than from multiple providers.  The statements made by the Charter representative to McKee about the scope of the work in the Master Agreement do not suggest that the parties intended to confer exclusive rights upon Shamrock.

Finally, Shamrock relies upon testimony by McKee to the effect that he believed that the Master Agreement granted Shamrock exclusive rights.  However, McKee's subjective beliefs alone do not materially affect the analysis.

> It is the actions, and not the intentions or suppositions, of the parties that determine whether or not there is a contract and the terms of the contract.  Under the objective theory of contracts applied in Missouri since 1892, the stress is on the outward manifestation of assent made to the other party, in contrast to the older idea that a contract was a true 'meeting of the minds.'

*Brock v. Blackwood*, 143 S.W.3d 47, 59-60 (Mo. App. 2004) (quoting *Double D Tractor Parts, Inc.*, 115 S.W.3d 363, 369 (Mo. App. 2003)).  As such, courts will disregard "either party's secret surmise or undisclosed assumption" when ascertaining the parties intent.  *Id.*  Rather, what is important is

17

what the parties say and do in the presence of each other and in their communications to each other that determines whether they have reached an agreement and what that agreement consists of. McKee may have hoped and even believed that the Master Agreement established exclusive rights for Shamrock.  However, in support of such a belief, McKee's testimony offers no reasonable basis grounded upon anything that was actually said or done by Charter or its representatives.  Thus, McKee's subjective belief cannot support that exclusivity was a term included in the parties' agreement.

Even if a written agreement is deemed to contain ambiguity, where extrinsic evidence of the parties' intent is so one sided that no genuine issue of fact exists thereupon, a claim for breach of contract is subject to disposition as a matter of law on summary judgment.  *See Bristol-Myers Squibb Co. v. Ikon Office Solutions, Inc.*, 295 F.3d 680, 684 (7th Cir. 2002) (construing Missouri law); *Commerce Trust Co. v. Howard*, 429 S.W.2d 702, 705-06 (Mo.1968); *3Com Corp. v. Banco do Brasi, S.A.*, 171 F.3d 739, 747 (2d Cir. 1999); *Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD*, 768 F.2d 5, 8 (1st Cir. 1985) (Breyer, J.); *Palmer v. Fuqua*, 641 F.2d 1146, 1155 n.15 (5th Cir. Unit A April 1981)[9] (recognizing that even where the interpretation of a contract may be a question of fact, "'if the evidence is so clear that no reasonable man would determine the issue before the court in any way but one,' the issue is one that is properly for the judge to determine."  (quoting 3 A. Corbin, Corbin on Contracts § 554 at 222)); *see also, e.g., Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1237-38 (11th Cir. 2008) ("Even if the contract's language were sufficiently ambiguous as to intent regarding the 2002 Contract to allow us to consider parol evidence, we find that the only

---

[9]The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

reasonable conclusion to be drawn from the evidence at trial is that the parties intended novation.").

Regardless of whether the Master Agreement is construed to unambiguously so provide or whether

that writing is supplemented by the extrinsic evidence in the record, the court concludes that the only

reasonable conclusion to be drawn is that the parties did not intend to grant Shamrock exclusive

rights.   Therefore, Charter's motion for summary judgment is due to be granted as it relates to

Shamrock's claims for breach based upon the theory that Charter violated Shamrock's exclusive

rights simply by hiring Crown Fiber or other contractors to work in the territory identified by the

Master Agreement.

### B.        The Covenant of Good Faith and Fair Dealing

Charter contends that it is also entitled to summary judgment on Shamrock's remaining

claims, that Charter is liable for breaching the covenant of good faith and fair dealing because

Charter employees accepted bribes and kickbacks from Crown Fiber, causing Charter to grant

preference in work assignments in the territory covered by the Master Agreement to Crown Fiber

at Shamrock's expense.   Shamrock opposes Charter's motion, arguing such conduct by Charter "is

the epitome of bad faith."   (Shamrock Opp. Brief at 33).   Shamrock maintains that

> even if Charter is correct ... that the contract only rendered Shamrock eligible for
> some work within the territory [covered thereby], to be assigned to Shamrock or
> another contractor by Charter at its discretion, the implied covenant of good faith and
> fair dealing required Charter to exercise such discretion in good faith and consistent
> with the spirit of the bargain it made with [Shamrock.]"

(*Id.*)   The parties agree that these claims, like those founded upon Shamrock's allegedly exclusive

contract rights, are also governed by the substantive contract law of Missouri.[10]

---

[10]Although Shamrock's complaint delineates separate counts for claims alleging "breach of contract"
(Count Two) and claims alleging "breach of the duty of good faith and fair dealing" (Count Three), technically
speaking, under Missouri law, a claim for breach of the duty of good faith and fair dealing in this context is actually

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers*

*Elec. Co-op., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. 1998). However, the

implied covenant of good faith and fair dealing "has nothing to do with the enforcement of terms

actually negotiated and cannot block [the] use of terms that actually appear in the contract." *Stone*

*Motor Co. v. General Motors Corp.*, 293 F.3d 456, 467 (8th Cir. 2002) (citation omitted) (applying

Missouri law). Further,

> [t]he covenant of good faith and fair dealing is not " 'an overflowing cornucopia of
> wished-for legal duties.' " *Schell v. LifeMark Hosps. of Mo.*, 92 S.W.3d 222, 230
> (Mo. App. 2002)(quoting *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d
> 1063, 1066 (8th Cir. 1996)). Rather, it encompasses only "an obligation imposed by
> law to prevent opportunistic behavior, that is, the exploitation of changing economic
> conditions to ensure gains in excess of those reasonably expected at the time of
> contracting." [*Spencer Reed Group, Inv. v. Pickett*, 163 S.W.3d 570, 574 (Mo. App.
> 2005)]; *Schell*, 92 S.W.3d at 230. " 'That duty prevents one party to the contract to
> exercise a judgment conferred by the express terms of agreement in such a manner
> as to evade the spirit of the transaction or so as to deny the other party the expected
> benefit of the contract.' " *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251
> S.W.3d 362, 370 (Mo. App. 2008) (citation omitted).

*Zubres Radiology v. Providers Ins. Consultants*, 276 S.W.3d 335, 340 (Mo. App. 2009).

Shamrock first argues that summary judgment is not appropriate on these claims because

there is a genuine issue of fact regarding whether the bribery scheme between Crown Fiber and

Charter employees was the reason that Charter assigned work to Crown Fiber rather than to

Shamrock. (Shamrock Opp. Brief at 21). However, Charter has not moved for summary judgment

based upon any potential lack of evidence to establish Shamrock's allegations with regard to either

---

but a species of claim for breach of contract. *See RGB2, Inc. v. Chestnut Plaza, Inc.*, 103 S.W.3d 420, 422 n.1 (Mo.
App. 2003); *American Equity Mortg., Inc. v. First Option Mortg., LLC*, 2009 WL 5220158, *5 (E.D. Mo. December
31, 2009) (unpublished) (citing *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. App. 2000)); *cf.*
*Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1125-26 (8th Cir. 2006) (holding that where a plaintiff's claims for
breach of contract and for breach of the covenant of good faith and fair dealing under Missouri law rested on the
same facts, there could be only one recovery).

the existence of such a bribery scheme or that the it resulted in Charter assigning work to Crown Fiber. Rather, Charter claims that it is entitled to summary judgment even if Shamrock's allegations on those matters are credited, *i.e.,* any fact issues regarding the existence or effect of the bribery scheme not "material" within the meaning of Rule 56(c)(2), Fed. R. Civ. P. Accordingly, the question before the court is whether Shamrock's claims might be precluded as a matter of law even assuming *arguendo* that Charter assigned work to Crown Fiber instead of Shamrock as a consequence of bribes or kickbacks paid by Crown Fiber.

Charter argues that it cannot be found liable for breaching the covenant of good faith and fair dealing because whether to award any additional work to Shamrock or to other competing contractors, including Crown Fiber, was a matter committed entirely to Charter's discretion under the contract between the parties. The court agrees. As previously discussed, the record establishes as a matter of law that the parties' contract here did not include a term granting Shamrock exclusive rights to perform work for Charter in the covered territory. The fundamental premise of Shamrock's argument is that, even if Charter had discretion to award work as between eligible contractors, it was obligated to exercise that discretion in a "good faith" manner, which Shamrock appears to assume necessarily includes only purely economically competitive or otherwise "legitimate" criteria. The difficulty with Shamrock's position is that the terms of the Work Description of the Master Agreement belies the existence of such limitations in Charter's discretion in assigning work to Shamrock or other contractors. The contract provides that Shamrock was not authorized to perform or be paid for any work unless Charter issued a purchase order setting forth the specific work to be done. The Master Agreement further states that "subsequent purchase order (sic) may, solely at the **CABLE COMPANY'S** discretion, be issued without executing a new **AGREEMENT**" prior to

21

December 31, 2000, and that Charter was "under no obligation to provide [Shamrock] consistent work during the entire effective period of **AGREEMENT**." (Master Agreement at 14). Even assuming that such language can be read to suggest that Charter would be issuing an initial purchase order, there is no dispute that Charter issued many purchase orders to Shamrock, resulting in approximately $2.7 million in business during 2000. Under the contract, however, whether to issue any other "subsequent" purchase orders was a matter then left to Charter's "sole discretion," so Charter cannot be held liable for breaching the covenant of good faith and fair dealing for failing to award Shamrock work to which it plainly had no contractual entitlement. *See Danella* 775 F. Supp. at 1236 ("Defendant[ telephone company's] refusal to consider plaintiff [contractor] for additional jobs was not a violation of the implied duty of good faith and fair dealing because plaintiff had no contractual right to be considered for any jobs by defendant under the clear terms of the continuing unit price agreements.").

Shamrock relies upon *Missouri Consolidated Health Care Plan v. Community Health Plan*, 81 S.W.3d 34 (Mo. App. 2002), as precluding summary judgment on these claims. In that case, Community Health Plan ("Community"), an HMO, contracted with Missouri Consolidated Health Care ("MCHCP") to provide health care benefits for state employees and other public entities in Missouri. *Id.* at 37. When Community began experiencing financial losses under the contract and when MCHCP refused to allow Community to increase its premiums, Community decided to eliminate a portion of its provider network for state employees. *Id.* MCHCP thereafter filed suit for declaratory and injunctive relief and for specific performance, and Community counterclaimed for, *inter alia*, breach of the covenant of good faith and fair dealing implied in their contract. *Id.* Specifically, Community argued MCHCP was obligated but had failed to act in good faith in

exercising discretion under the contract in connection with determining whether to grant Community a premium rate increase beyond a cap rate tied to the consumer price index ("CPI"). *Id.* at 45. Under the contract, rates might be increased over the CPI cap "at the discretion of the MCHCP Board of Trustees," with the stipulation that to "receive this consideration, [Community] must provide substantial evidence of a significant adverse financial condition in regard to this contract and pay for an audit of such data by a reputable and qualified third party to be selected by MCHCP." 81 S.W.3d at 46. After the jury found for Community on its claim that MCHCP had not acted in good faith in denying such a rate increase, MCHCP argued that it was entitled to judgment as a matter of law on multiple grounds, including on the theory that, because the contract committed the issue of whether to grant an increase to MCHCP's "discretion," any action it took in that regard could not breach the covenant of good faith and fair dealing, "irrespective of whether it acted in good faith, bad faith or in its own self-interest." *Id.* at 45. The Missouri Court of Appeals rejected MCHCP's argument, explaining that while the rate increase matter had been committed to MCHCP's discretion, MCHCP was still obligated to exercise that discretionary power in good faith, so as not to evade the spirit of the transaction or deny Community the expected benefit of their contract. *Id.* at 46.[11]

*Missouri Consolidated Health Care Plan* does not require or counsel a result on these claims different from the one the court reaches today. In that case, the contract had allocated to MCHCP discretion to decide whether to allow a pay rate increase over the CPI, but its terms also clearly indicated that Community had a legitimate expectation that it might receive such an increase upon

---

[11] While the Missouri Court of Appeals reasoned that the mere fact that the contract had committed the rate increase question to MCHCP's discretion could not alone preclude liability for breach of the duty of good faith, the court ultimately held that MCHCP was entitled to prevail as a matter of law because the evidence failed to show that MCHCP had exercised its discretion so as to evade the spirit of the transaction or to deny Community the expected benefit of the contract. *Id.* at 46-49.

23

presentation of "substantial evidence of a significant adverse financial condition," supported by a third-party financial audit.  While MCHCP was vested with "discretion" to determine whether Community had made the requisite showing, to allow MCHCP to make that assessment with absolute impunity or in bad faith would effectively nullify the contract provision recognizing that adequate proof of changed conditions might support a rate increase.  By contrast, the Master Agreement in the case *sub judice* commits the matter of whether to issue purchase orders for any additional work for Shamrock to Charter's "*sole* discretion" and makes clear that Charter is not obligated to provide any particular quantity of work to Shamrock.  In other words, Charter's discretion is *unfettered,* and Shamrock could have no *legitimate* expectation under the contract to be awarded any additional work.  Accordingly, Charter's decisions in exercising that bargained-for power regard cannot violate the covenant of good faith and fair dealing. *Cf. Newco Atlas, Inc. v. Park Range Const., Inc.*, 272 S.W.3d 886, 893-94 (Mo. App. 2008) (termination of an "at-will" distributorship agreement does not violate the duty of good faith and fair dealing); *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 524 (Mo. App. 2007) (same, with "at-will" employment contracts).  Charter's motion for summary judgment is due to be granted as it relates to Shamrock's claims alleging breach of the covenant of good faith and fair dealing.[12]

---

[12]Because Charter is entitled to summary judgment on all remaining claims based upon the record evidence establishing that Shamrock cannot prevail on the merits of its claims, the court need not address Charter's alternative arguments that Shamrock's claims are also barred by the applicable statutes of limitation.

## IV.     CONCLUSION

Based on the foregoing, Charter's motion for summary judgment (Doc. 69) is due to be GRANTED, and this action is due to be DISMISSED WITH PREJUDICE.  An appropriate final order will be entered.

As to the foregoing it is SO ORDERED this the 5th day of August, 2010.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE